IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello

Civil Action No. 19-cv-01617-CMA-STV

WELL MASTER CORPORATION, *a Colorado corporation*,

    Plaintiff,

v.

LUCKYSHOT, LLC, *a Colorado limited liability company*,
LUCKYSHOT CNC, LLC, *a Colorado limited liability company,* and
SHANE ALLEN FAZZI,

    Defendants.

---

## ORDER ON CLAIM CONSTRUCTION

---

This matter is before the Court on the parties' Joint Motion for Determination of Claim Construction. (Doc. # 98.) For the following reasons, the Court determines that no construction of the disputed claim terms is necessary.

### I.    BACKGROUND

This patent infringement action arises out of two patents owned by Plaintiff—U.S. Patent Nos. 7,395,865 ("the '865 Patent") (Doc. # 1-6) and 7,793,728 ("the '728 Patent") (Doc. # 1-7) (collectively, "the Patents"). Both Patents concern a plunger device for use in plunger lift systems for oil and gas wells. The Patents were issued to Mr. Robert E. Bender, Plaintiff's founder, on July 8, 2008 ('865 Patent) and September 14, 2010 ('728

Patent) respectively. The Patents share the same specification. Both involve the following:

> a plunger arrangement for moving up and down in a tubing string in a plunger lift system for an oil and gas well, the plunger having a gas seal arrangement comprising: an elongated plunger body having an upper end and a lower end, the plunger having a longitudinal axis, with a plurality of circumferentially grooves spaced longitudinally apart on an outer surface of the plunger body. A longitudinal bore is arranged within the plunger, extending from an opening in the lower end of the plunger, and an arrangement of fluid side-holes or passageways extend from the bore to the outer surface of the plunger body to permit gas flow therethrough to direct a turbulent flow of fluid about the plunger.

(Doc. # 1-6 at 4); (Doc. # 1-7 at 4).

Plaintiff initiated the instant lawsuit on June 5, 2020, and filed its First Amended Complaint and Jury Demand ("Amended Complaint") on June 17, 2020. *See* (Doc. # 87). Therein, Plaintiff alleges that Defendants have infringed over 27 total claims from the '865 Patent and the '728 Patent through their unauthorized manufacture, use, offer for sale, and sale of well plunger lift devices. *See* (*id.* at 2); (Doc. ## 1-3, 1-4). Plaintiff brings the following four counts of patent infringement in violation of 35 U.S.C. § 271(a)-(c) against Defendants:

(1)   Infringement of the '865 Patent by Defendants LuckyShot LLC and LuckyShot CNC LLC;

(2)   Infringement of the '728 Patent by Defendants LuckyShot LLC and LuckyShot CNC LLC;

(3)   Inducing Infringement of the '865 Patent by Defendants Shane Allen Fazzi and Colin L. Dutton; and

(4)   Inducing Infringement of the '728 Patent by Defendant Shane Allen Fazzi and Colin L. Dutton.

In this action, Plaintiff seeks to recover all damages associated with Defendants' alleged infringement of the Patents, as well as attorneys' fees and costs, and to enjoin Defendants from further infringement. Defendants filed their Opening Claim Construction Brief on July 10, 2020. (Doc. # 93.) Plaintiff responded to the Opening Brief on July 31, 2020 (Doc. # 94), and Defendants filed their Reply on August 7, 2020 (Doc. # 97). The parties' Joint Motion for Determination of Claim Construction (Doc. # 98) followed.

In their briefing, the parties dispute the meaning of two claim terms in the Patents—i.e., "longitudinal axis" and "fluid passageways."[1] Defendants argue that, if the Court does not adopt their proposed constructions, the claims are invalid for indefiniteness and/or lack of written description under 35 U.S.C. § 112. Plaintiff responds that neither term requires construction because each can be understood according to its plain and ordinary meaning. The Court held a *Markman* hearing on this matter on October 15, 2020, and took the matter under advisement.

## II.    LEGAL STANDARDS

The fundamental purpose of a patent is to give notice to others of that in which the inventor claims exclusive rights. *Oakley Inc. v. Sunglass Hut International*, 316 F.3d 1331, 1340 (Fed. Cir. 2003). Thus, the focus of claim construction is ascertaining how a

---

[1] The Court notes that the Joint Chart of Disputed Claims includes six disputed claim limitations—i.e., "longitudinal axis," "fluid passageways," "angle with respect to said longitudinal axis," "radially outwardly," "tangentially with respect to said bore," and "spiral array"—but the parties briefed only the first two claims terms—i.e., "longitudinal axis" and "fluid passageways"— in their claim construction briefing. *Compare* (Doc. # 85-1 (Chart)) *with* (Doc. ## 93, 94, 97 (Briefing)). The Court limited oral argument at the *Markman* hearing to the terms "longitudinal axis" and "fluid passageways" and will limit its analysis accordingly herein.

reasonable competitor would interpret the actual claim language, not what the inventor subjectively intended the language to claim. *Id.* at 1340–41. The words used in the patent are evaluated according to their "ordinary and customary meaning," as would be understood by a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc).

In some circumstances, the specification may reveal that the inventor specifically, albeit idiosyncratically, defined a term in a way that might differ from the meaning it would otherwise possess. Where the intrinsic record **clearly** discloses that the inventor resorted to his or her own peculiar lexicography, the Court will give effect to the inventor's unique idiom; however, where the inventor used particular words without giving a clear indication of an intent to endow them with an unusual meaning, the Court will give those words their ordinary and customary meaning, notwithstanding the inventor's subjective intent to invoke a different definition. *See, e.g., Laryngeal Mask Co. v Ambu*, 618 F.3d 1367, 1372 (Fed. Cir. 2010).

In attempting to give meaning to the inventor's language, the Court "looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Phillips,* 415 F.3d at 1314. Among those sources are: (i) the words of the claims themselves; (ii) the remainder of the patent's specification; (iii) the prosecution history of the patent; (iv) extrinsic evidence concerning relevant scientific principles; (v) the common meanings of technical terms used; and (vi) the state of the art at the time of the invention. *Id.* Terms must be construed in light of the entirety of the patent, not just in the context of the particular

claim(s) they appear in. *Id.* at 1313. In other words, claim language must be read in conjunction with the more general and descriptive specification portion of the patent; indeed, the specification is often "the single best guide to the meaning of a disputed term." *Id.* at 1315. Because the patent is examined as a whole, the Court assumes that claim terms will normally be used consistently throughout the patent, and thus, the meaning of a term used in one claim can illustrate the meaning of that same term used elsewhere in the patent. *Id.* at 1314.

As with the specification, evidence of the prosecution history of the patent can also be considered as intrinsic evidence of how the USPTO and the inventor understood the patent. *Id.* at 1317. The prosecution history reflects "an ongoing negotiation between the PTO and the applicant," and can sometimes demonstrate that the inventor limited or disclaimed some portion of a claim. *Id.*

Extrinsic evidence of disputed terms – that is, "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises" – can also shed light on the proper construction to be given to those terms, but extrinsic evidence "in general [is] less reliable than the patent and prosecution history in determining how to read claim terms." *Id.* at 1318. The court in *Phillips* articulated a variety of reasons why a court construing a patent should be wary of relying too heavily on extrinsic evidence, and cautions that, while admissible and potentially probative, courts should keep in mind the flaws inherent in each kind of extrinsic evidence and assess that evidence accordingly. *Id.* at 1318–19.

### III.   DISCUSSION

The parties dispute the meaning of two claim terms in the Patents—"longitudinal axis" and "fluid passageways"—as follows:

| CLAIM TERM | PLAINTIFF'S INTERPRETATION | DEFENDANTS' INTERPRETATION |
|---|---|---|
| **Longitudinal Axis** | No construction needed - plain and ordinary meaning. | The center line axis of the bore of the elongated plunger body along the circumferentially spaced grooves, wherein the axis terminates at the lower and upper end of the bore. |
| **Fluid Passageways** | No construction needed – plain and ordinary meaning. | Holes that extend from the bore and terminate in the grooves. |

As discussed below, the Court agrees with Plaintiff that claim construction is not required for either term, as both can be understood according to their plain and ordinary meaning. Moreover, the Court concludes that Defendants have failed to prove that the claim terms are invalid for indefiniteness or lack of written description under 35 U.S.C. § 112.

### A.   LONGITUDINAL AXIS

With respect to the term "longitudinal axis," Plaintiff argues that the term can be understood according to its plain and ordinary meaning. Defendants argue that the term requires construction and that to hold otherwise would render the term indefinite. (Doc. # 93 at 5–6.) To support their argument, Defendants point to two references to the "longitudinal axis **of the bore**" in the specification of the '865 Patent.

Where the inventor used particular words without giving a clear indication of an intent to endow them with an unusual meaning, the Court will give those words their

ordinary and customary meaning. *See, e.g., Laryngeal Mask Co.*, 618 F.3d at 1372. Here, the Court finds that the inventor used the term "longitudinal axis" without giving a clear indication of an intent to endow that term with an unusual meaning, so the Court gives the term "longitudinal axis" its ordinary and customary meaning.

"It has been long recognized . . . that dictionaries, encyclopedias, and treatises are particularly useful resources to assist the court in determining the ordinary and customary meanings of claim terms." *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002). According to Merriam-Webster's Dictionary, "longitudinal" is defined as "of or relating to length or the lengthwise dimension." (Doc. # 94-1 at 1.) "Axis" is defined as "a straight line about what a body or a geometric figure rotates or may be supposed to rotate," such as the Earth's axis. (*Id.* at 3.) Putting these definitions together, "longitudinal axis" means "a straight line of the lengthwise dimension about which a body or geometric figure rotates or is supposed to rotate." To this effect, Wikipedia defines "longitudinal axis" as **"**a line passing through the centroid of the cross sections" or "a direction of orientation, going from head to tail." (*Id.* at 5.)

Defendants urge the Court to limit the term "longitudinal axis" to mean the center line axis **of the bore** of the elongated plunger body, with the axis terminating at the lower and upper end of the bore. However, this construction impermissibly restricts the claim term.

Looking to the Patents, there are numerous instances where "longitudinal axis" is used to refer to the entire plunger, not just the bore. Indeed, the term "longitudinal axis"

7

appears in the '865 Patent 23 times, and 17 of those uses refers to the plunger generally, not the bore in particular:

- Claim 1 states: "an elongated plunger body having an upper end a lower end, said plunger having a longitudinal axis . . . ." (Doc. # 1-6 at 5);

- Claim 7 states: "rotating said elongated plunger about a longitudinal axis thereof . . . ." (*Id.* at 6);

- Claim 9 states: "spinning said plunger about its longitudinal axis . . . ." (*Id.*);

- The Brief Summary includes three such references: "the plunger having a longitudinal axis. . . ."; "rotating the elongated plunger about a longitudinal axis thereof, as the plunger travels through the tubing string in the plunger lift system"; and "spinning the plunger about its longitudinal axis so as to generate turbulence in gas surrounding the plunger . . . ." (*Id.* at 4);

- The Detailed Description describes "an elongated gas lift plunger [ ] having a longitudinal axis 'L'," which refers to Figure 2 on Page 3, where L points to a line at the top of the plunger. This description is repeated, stating "[t]he side holes [ ] are shown arranged at an acute angle with respect to the longitudinal axis 'L' of the plunger . . . ." and a "tangential passageway [ ] helps rotate the plunger [ ] about its longitudinal axis 'L' to give the plunger [ ] a 'pinwheel' effect . . . ." (*Id.* at 5.)

Further, the specification makes clear when it is referring to the longitudinal axis of the bore in particular—e.g., "The side holes in one embodiment may be arranged radially with respect to the longitudinal axis of the bore." This distinction reinforces the Court's finding that the Patents use the term "longitudinal axis" to refer not only to the bore.

Defendants have not presented any evidence to establish that a reasonable competitor would either interpret "longitudinal axis" contrary to its plain and ordinary meaning or find that "longitudinal axis" is ambiguous. *See Oakley Inc.*, 316 F.3d at 1340. Therefore, upon review of the Patents, the Court concludes that the plain and

8

ordinary meaning of the term "longitudinal axis" is sufficient to give notice to others of that in which the inventor claims exclusive rights, and claim construction is unnecessary. *See id*.

**B.     FLUID PASSAGEWAYS**

Likewise, with respect to the term "fluid passageways," Plaintiff argues that the term can be understood according to its plain and ordinary meaning. Defendants argue that the term requires construction because to hold otherwise would render the term indefinite. In support of their position, Defendants argue that the "specification of the '865 Patent equates 'fluid passageways' with 'fluid side-holes'," and that "all of the side holes disclosed on the '865 Patent terminate in the grooves." Thus, the term "fluid passageways" is more limited than its plain and ordinary meaning. The Court again agrees with Plaintiff.

According to Merriam Webster's Dictionary, "fluid" is defined as "a substance (such as a liquid or gas) tending to flow or conform to the outline of its container." (Doc. # 94-1 at 6.) "Passageway" is defined as "a way that allows passage." (*Id.* at 8.) Combining these definitions, "fluid passageways" are "ways that allow passage for a substance (such as a liquid or gas) tending to flow or conform to the outline of its container."

Defendants seek to restrict the term to mean "holes that extend from the bore and terminate in the grooves." However, the specification does not demonstrate an intent to endow the term "fluid passageways" with an unusual meaning. *See, e.g.*, *Laryngeal Mask Co.*, 618 F.3d at 1372. Indeed, the specification describes multiple

9

kinds of passageways, referring to "passageways," "side holes," "passages," and "channels." *See, e.g.*, (Doc. # 1-6 at 4) (stating "an arrangement of fluid side-holes or passageways extend from the bore to the outer surface of the plunger body to permit gas flow therethrough to direct a turbulent flow of fluid about the plunger. In one embodiment, at least one of the passageways extends radially outwardly in the plunger body from said bore.").

Further, Defendants' proposed construction is inconsistent with at least one claim limitation. Claim 1 of the '865 Patent describes "an arrangement of fluid passageways extending from said bore **to an outer [s]urface of said plunger body**, wherein at least one of said passageways extends at an acute angle with respect to said longitudinal axis of said plunger body from said bore, to permit gas flow therethrough to direct a turbulent flow of fluid about said plunger." (*Id.* at 5) (emphasis added). Defendants' restriction on the passageways to terminate in the grooves conflicts with Claim 1's qualification that the passageways extend from the bore to an unspecified outer surface of the plunger body. Put differently, the statement that **at least one** of the passageways extends from the bore does not require that **all** passageways extend from the bore. Accordingly, Defendants' proposed construction is improper because it is inconsistent with the claim limitations. *See Aristocrat Techs. Austl. PTY Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1356 (Fed. Cir. 2013).

Defendants have not presented any evidence to establish that a reasonable competitor would interpret "fluid passageways" contrary to its plain and ordinary meaning. *See Oakley Inc.*, 316 F.3d at 1340. Nor have they persuaded this Court that

the Patents demonstrate an intent to endow the term "fluid passageways" with an unusual meaning. Accordingly, the Court concludes that the plain and ordinary meaning of the term "fluid passageways" is sufficient to give notice to others of that in which the inventor claims exclusive rights. *See, e.g., Laryngeal Mask Co.*, 618 F.3d at 1372. Therefore, claim construction of this term is also unnecessary.

**C.      INVALIDITY FOR INDEFINITENESS AND LACK OF WRITTEN DESCRIPTION**

      1.      <u>Indefiniteness</u>

A claim is invalid for indefiniteness under 35 U.S.C. § 112 if, when read in light of the specification and the prosecution history, it "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Proving indefiniteness requires "clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

Defendants have fallen far short of their burden of proving that the claims are indefinite by clear and convincing evidence; indeed, they have presented no evidence at all. As the Court has concluded that both disputed claim terms can be understood according to their plain and ordinary meaning, the Court also concludes that the terms are "sufficiently definite to inform the public of the bounds of the protected invention, i.e., what subject matter is covered by the exclusive rights of the patent." *Halliburton Energy Servs., Inc.*, 514 F.3d at 1249. Therefore, the terms are not indefinite.

              2.     Lack of Written Description

Defendants also argue that, if the disputed claim terms are not construed as they suggest, the claims would be invalid for failure to comply with Section 112(a)'s written description requirement. Section 112(a) requires that the specification contain "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." 35 U.S.C. § 112(a). "The purpose of this provision is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000).

As with indefiniteness, "[t]o overcome the presumption of validity of patents, the accused must show that the claims lack a written description by clear and convincing evidence." *See Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1351 (Fed. Cir. 2011). Defendants again fall short of their burden of proving that the claims lack a written description by clear and convincing evidence. The Court cannot conclude that the written description of the invention fails to "enable any person skilled in the art. . . to make and use [the invention]" because Defendants have failed to produce any evidence that goes to the ability of a person skilled in the art to interpret the Patents (e.g., expert witness testimony). *See* 35 U.S.C. § 112(a).

Finally, the Court rejects Defendants' argument that U.S. Patent No. 6,200,103 ("the '103 Patent") somehow bears on the analysis herein. *See generally* (Doc.# 97-1).

The '103 Patent is an earlier, unrelated patent issued to Mr. Bender on March 13, 2001. Unlike the instant Patents, the '103 Patent provides for a solid plunger. Moreover, although the '865 Patent incorporates the '103 Patent by reference twice—once in the Background Art section[2] and once in referring to the grooves of the plunger[3]—the '103 Patent does not contain either a bore or fluid passageways. Accordingly, it has no bearing on either (a) the meaning of the term "fluid passageways," or (b) Defendants' proposed construction of the term "longitudinal axis," which is the "longitudinal axis **of the bore**."

## IV. CONCLUSION

For the foregoing reasons, the Court declines to construe the '865 Patent or the '728 Patent because the disputed claim terms "longitudinal axis" and "fluid passageways" can be understood according to their plain and ordinary meaning.

DATED: November 25, 2020

BY THE COURT:

CHRISTINE M. ARGUELLO
United States District Judge

---

[2] *See* (Doc. # 1-6 at 6) ("Plunger lift systems are artificial lift systems for oil and gas wells. U.S. Pat. No. 6,200,103 to Bender, incorporated herein by reference, discloses a gas lift plunger having a cylindrical elongated plunger body. The plunger body has a plurality of spaced, shaped circumferential grooves.").

[3] *See* (*id.* at 5) ("Preferably the grooves [ ] are sized, shaped and spaced as set forth in U.S. Pat. No. 6,200,103 and as shown in FIG. 4.").

13